**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

MEMBERSELECT INSURANCE
COMPANY, as subrogee of DAVID GILLIE,

            Plaintiff,

    v.                               No. _____

TESLA, INC.

            Defendant.

**NOTICE OF REMOVAL**

Pursuant to 28 U.S.C. § 1441 and 1446, Defendant Tesla, Inc., ("Tesla") gives notice that the case captioned *MemberSelect Insurance Company, as subrogee of David Gillie v. Tesla, Inc.,* Lake County Circuit Court Illinois Case No. 18-L-95, is removed to the United States District Court for the Northern District of Illinois, from the Circuit Court for the County of Lake, Illinois, where Plaintiffs originally filed it on or about February 1, 2018. Tesla was served on or about February 20, 2018. True and correct copies of all process and pleadings served upon Tesla in that action are attached as **Exhibit 1 – Complaint and Jury Demand.**

**<u>Statement of Grounds for Removal</u>**

1.    Tesla bases this Notice of Removal on 28 U.S.C. § 1441(a), which allows removal of any state-court civil action over which the District Courts of the United States have original jurisdiction.

2.      Federal Courts have original jurisdiction over this dispute because there is complete diversity of citizenship between the parties in this action and the jurisdictional amount in controversy is satisfied.  *See* 28 U.S.C. §1332.

3.      Plaintiff MemberSelect Insurance Company, as subrogee of David Gillie, is a Michigan corporation with its principal place of business in the City of Dearborn, Wayne County, Michigan.  Compl. ¶ 1.

4.      David Gillie is a citizen and resident of the State of Michigan.  Compl. ¶ 2.

5.      Tesla is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business in Palo Alto, California.  Compl. ¶ 3.

6.      Plaintiff seek $112,445.54 it paid for damage to the vehicle itself, allegedly pursuant to the terms of its insurance policy, as the subrogee of David Gille. Compl. ¶ 32.

7.      Plaintiff also states that "Mrs. Gillie sustained significant personal injuries as a result of the Collision" but does not allege that any benefits were paid to her nor does Plaintiff specify an amount it seeks for these injuries in this subrogation action. Compl. ¶ 33.

9.      On these facts, Tesla reasonably believes and therefore avers that if Plaintiff proves each element of its claims and if Tesla's defenses all fail, the amount in controversy in this action exceeds $75,000, exclusive of interests and costs.

10.     This Notice of Removal is timely under 28 U.S.C. §1446(b), as it is filed "within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based. . . ." *Id*. Plaintiffs filed this action in the Circuit Court for the County of Lake, Illinois, on February 1, 2018; Tesla was served on or about February 20, 2018.  Accordingly, Tesla's removal of this case is timely.

2

11.     Tesla has not served an Answer or responsive pleading to the Complaint, nor made any appearance or argument before the Circuit Court for the County of Lake, Illinois.

12.     In accordance with 28 U.S.C. §1446(d), concurrently with filing this Notice of Removal, Tesla will give written notice of the removal to Plaintiff and will file a true and correct copy of this Notice of Removal with the Clerk of the Circuit Court for the County of Lake, Illinois.

13.     Tesla submits this Notice without waiving any of its rights and defenses to the claims asserted by Plaintiffs or conceding that Plaintiffs have pleaded claims upon which relief can be granted.

14.     Tesla submits the Notice without waiving its right to challenge venue in the Northern District of Illinois and will seek to change venue. Tesla states only that removal is proper and required to be made to this Court, as the Northern District of Illinois is the federal district in which the Circuit Court of Lake County, Illinois—where MemberSelect filed its Complaint—is located pursuant to 28 U.S.C. § 1446(a).

15.     Tesla also does not admit any of the factual allegations in the complaint, and instead reserve the right to contest those allegations at the appropriate time. By filing an answer in this Court within seven (7) days of this removal as required by Fed. R. Civ. P. 81, Tesla does not consent to venue in this Court and specifically reserves its right to challenge venue.  Filing an Answer in this Court would be only to prevent the entry of a default.

16.     Tesla further reserves the right to raise any proper basis to assert and maintain any positions regarding the continued exercise of and additional bases for federal jurisdiction over any or all of this matter, once removed and all other defenses to the allegations in Plaintiff's Complaint.

17.     All of the other prerequisites for removal under 28 U.S.C. §§ 1441 and 1446 have

been met.

WHEREFORE, Tesla gives notice that the referenced action now pending in the Circuit

Court for the County of Lake, Illinois, has been removed to this Court.

DATED:          March 22, 2018                    Respectfully Submitted,

                                                  /s/ Thomas P. Branigan
                                                  Thomas P. Branigan (ARDC No. 6271048)
                                                  Matthew G. Berard (ARDC No. 6312341)
                                                  BOWMAN AND BROOKE LLP
                                                  41000 Woodward Avenue
                                                  Suite 200 East
                                                  Bloomfield Hills, MI 48304
                                                  Tel:     (248) 205-3300
                                                  Fax:     (248) 205-3399
                                                  tom.branigan@bowmanandbrooke.com
                                                  matthew.berard@bowmanandbrooke.com

                                                  *Attorneys for Tesla, Inc.*

                                                  George M. Velcich (ARDC No. 3127772)
                                                  Sudekum, Cassidy & Shulruff, Chtd.
                                                  20 N. Clark St.  #2450
                                                  Chicago, IL  60602
                                                  Tel: (312) 803-6250
                                                  gmv@scslegal.com

                                                  *Local Counsel for Tesla, Inc. per LR 83.15*

4

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing was served by U.S. mail and email on the following counsel on the 22nd day of March, 2018, as well as filed using this Court's CM/ECF system:

Robert Ostojic
Nick V. Marinkovich
LEAHY, EISENBERG & FRAENKEL, LTD.
33 West Monroe Street
Suite 1100
Chicago, Illinois 60603
ro@lefltd.com

/s/ Thomas P. Branigan

# EXHIBIT 1

FILED
2/1/2018 10:18 AM
ERIN CARTWRIGHT WEINSTEIN
Clerk of the Circuit Court
Lake County, Illinois

**IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT**
**LAKE COUNTY, ILLINOIS**

MEMBERSELECT INSURANCE )
COMPANY, as subrogee of DAVID )
GILLIE, )
          )
          Plaintiff, )
          )    Case No.: **18L95**
v. )
          )
TESLA, INC., )
          )
          Defendant. )

**COMPLAINT**

NOW COMES the Plaintiff, MEMBERSELECT INSURANCE COMPANY, as subrogee of DAVID GILLIE, by and through its attorneys, LEAHY, EISENBERG & FRAENKEL, LTD., and for its Complaint against the Defendant, TESLA, INC., states as follows:

**PARTIES**

1. Plaintiff, MemberSelect Insurance Company ("MemberSelect"), is an authorized Michigan domiciled company with its principal place of business located in Dearborn, Michigan.

2. Plaintiff's subrogor, David Gillie ("Mr. Gillie"), is an individual domiciled in the State of Michigan.

3. Defendant, Tesla, Inc. ("Tesla"), is a Delaware corporation with its principal place of business located in Palo Alto, California.

**NOTICE**
PURSUANT TO LCR - 2-2.14
THIS CASE IS HEREBY SET FOR AN INITIAL CASE MANAGEMENT CONFERENCE
05/22/2018 IN COURTROOM 303 ON 9:00AM A.M./P.M.
AT
FAILURE TO APPEAR MAY RESULT IN THE CASE BEING DISMISSED OR
AN ORDER OF DEFAULT BEING ENTERED.

1

## JURISDICTION AND VENUE

4.     Jurisdiction is proper in Illinois pursuant to 735 ILCS 5/2-209 because Tesla conducts substantial business in the State of Illinois and part of the transaction giving rise to this cause of action occurred in Illinois.

5.     Venue is proper in Lake County pursuant to 735 ILCS 5/2-101 because part of the transaction giving rise to this cause of action occurred in Lake County.

## ALLEGATIONS COMMON TO ALL COUNTS

6.     MemberSelect provided personal automobile coverage to Mr. Gillie, under a policy of insurance, policy number AUTO43586502 (the "Policy"), which was in full force and effect on September 15, 2016.

7.     MemberSelect asserts its claim as subrogee of Mr. Gillie, and is the bona fide owner of the claims and causes of action set forth herein, having obtained the same by reason of payments made to and on behalf of Mr. Gillie pursuant to the Policy and is therefore entitled to maintain this action for recovery of such payments.

8.     At all relevant times, Tesla, Inc. (formerly Tesla Motors, Inc.) was an automobile manufacturing and technology company that designed, developed, and manufactured highly technical electric vehicles and vehicle components which Tesla distributed, marketed, and sold via a network of company-owned dealerships throughout the United States.

9.     At all relevant times, Tesla-authorized dealerships were controlled and operated directly by Tesla. Tesla tightly controlled the marketing practices of its dealerships, the repair facilities within said dealerships, and trained the personnel at Tesla-authorized dealerships.

2

10.     At all relevant times, Tesla controlled and operated five Tesla-authorized dealerships in the State of Illinois, including the dealership located at 1200 Old Skokie Valley Road, Highland Park, Illinois in Lake County (the "Lake County Dealership").

11.     Tesla first entered the vehicle market in 2008 with the production of the Tesla Roadster, an all-electric sports car. In 2012, Tesla released the Model S, an all-electric luxury sedan. In 2015, Tesla released the Model X, an all-electric luxury crossover sports utility vehicle.

12.     According to Tesla, the Model X is one of the most technologically advanced and powerful production automobiles ever sold to the general public. Tesla prides itself on innovation, describing itself as a "software company as much as it is a hardware company."

13.     The Model X was "designed to be the safest car on the road," with every Model X coming "standard with automatic emergency braking and side collision avoidance to prevent accidents from happening in the first place."

14.     Tesla proclaimed that the Model X is the "safest, fastest, and most capable sport utility vehicle in history." In press releases, sales literature, brochures, online statements, and other consumer-oriented documents, Tesla has consistently promoted "safety" as top priority in all its vehicles, including the Model X.

15.     Tesla touts its "over-the-air software updates" which allow Tesla to "regularly improve the sophistication of these features, enabling increasingly capable safety and convenience features."

16.     Every Tesla vehicle produced since October 2014 is equipped with a hardware package that features radar, a forward-looking camera, ultrasonic sensors, and a high-precision digitally-controlled electric assist braking system. This hardware allowed for the

eventual introduction and activation of Tesla's semi-autonomous self-driving software known as Tesla Autopilot ("Autopilot").

17. In October 2015, Tesla released its much-anticipated Version 7.0 software update which included the Autopilot system. Upon its initial release, the Autopilot feature could only be enabled by customers who purchased an optional "Tech Package" at additional cost.

18. The Autopilot Version 7.0 software comprised multiple subsystems (including Autosteer, Auto Lane Change, Automatic Emergency Braking, Traffic-Aware Cruise Control, Side Collision Warning, and Autopark) that utilized a "combination of cameras, radar, ultrasonic sensors, and data" to, according to Tesla, "automatically steer down the highway, change lanes, and adjust speed in response to traffic".

19. According to Tesla, the Autopilot suite of features could automatically steer within a lane, manage speed by using active, traffic-aware cruise control, change lanes, and prevent the vehicle from wandering off the road, all without requiring the driver to touch the steering wheel.

20. Tesla's press release for the initial launch of Autopilot announced "Your Autopilot has arrived" promising to relieve drivers "of the most tedious and potentially dangerous aspects of road travel."

21. Tesla has been uniquely aggressive in its deployment and marketing of its semi-autonomous driving technology. While other prominent carmakers expressed concerns over the safety and prematurity of semi-autonomous driving systems, including Mercedes-Benz, BMW, and Volvo, Tesla remains the only company to launch a commercially available system that permits drivers to completely remove their hands from the steering wheel for extended periods of time. Additionally, Tesla remains the only company that offers a system

4

that permits the vehicle to automatically change lanes and overtake other vehicles without any driver input.

22.     Despite its suggestive name and accompanying marketing campaign, Autopilot (including its subsystems: Autosteer, Auto Lane Change, Automatic Emergency Braking, and Autopark) did not make a Tesla vehicle fully autonomous despite permitting the vehicle to fully operate without driver engagement. In other words, Tesla produced a semi-autonomous vehicle that misleadingly *appeared* to be fully autonomous.

23.     In June 2016, Mr. Gillie purchased a certain 2016 Tesla Model X 90D, VIN# 5YJXCBE21GF006123 (the "Vehicle"), from the Lake County Dealership. Mr. Gillie also purchased the optional "Tech Package" at additional cost which enabled use of the Autopilot feature.

24.     At all relevant times, Mr. Gillie was the true owner of the Vehicle.

25.     On September 15, 2016, and all relevant times herein, Mr. Gillie was driving the Vehicle along eastbound Interstate 94 near Hixton, Wisconsin.

26.     On September 15, 2016, and all relevant times herein, Mr. Gillie was driving the Vehicle at the above location while the Autopilot system was activated, with his wife, Michelle ("Mrs. Gillie") as a passenger.

27.     At the above time and place with Autopilot activated, the Vehicle suddenly and unexpectedly veered left across highway lane markers into a construction zone, causing the Vehicle to collide with a construction barricade (the "Collision").

28.     Though Mr. Gillie immediately performed an emergency maneuver by steering the Vehicle to the right to counter the Vehicle's sudden and unexpected veer to the left, Mr. Gillie could not prevent the Collision.

29.     On September 21, 2016, less than one week after the Collision, Tesla released its Autopilot 8.0 software update ("Autopilot 8.0"). Autopilot 8.0 fundamentally changed the functionality of the Autopilot system by modifying driver monitoring strategy and adding several new driver assistance safety features unavailable in Autopilot 7.0.

30.     Where Autopilot 7.0 relied primarily on the front-facing camera to detect obstacles; Autopilot 8.0 utilizes onboard radar as the primary source for Autopilot input which allows the vehicle to "see" through rain, fog, snow, or dust.  Using radar as the primary sensor instead of camera imaging prevents situations where, in the past, the vehicle would not react to an obstacle that was picked up by radar but not the camera.

31.     Notably, Autopilot 8.0 substantially increased the frequency and blatancy of warnings posed to drivers who remove their hands from the steering wheel, ultimately forcing the driver to restart the vehicle if repeated warnings are ignored.

32.     As a result of the Collision and pursuant to the Policy, MemberSelect made payment to Mr. Gillie for the significant damage caused to the Vehicle in the amount of $112,445.54, including the deductible.

33.     In addition to the damage caused to the Vehicle, Mrs. Gillie sustained significant personal injuries as a result of the Collision.

## COUNT I
## Strict Products Liability

34.     MemberSelect re-alleges and reasserts paragraphs 1 through 33 of the Complaint as though fully set forth herein as paragraph 34 of this Count I.

35.     At all relevant times, Tesla designed, manufactured, marketed, and distributed the Vehicle and component features, including Autopilot, which Tesla intended to be used as a passenger vehicle.

36.     At all relevant times, Tesla owed a duty to Mr. Gillie to safely and properly design, manufacture, market, and distribute the Vehicle and component features, including Autopilot, so that they were not unreasonably dangerous when used in the manner intended or in a manner reasonably foreseeable Tesla at the time the Vehicle left Tesla's control.

37.     At all relevant times, Tesla owed a duty to warn Mr. Gillie of any potentially dangerous conditions that Tesla knew, or should have known, existed within the Vehicle and component features, including Autopilot, of which could not be discovered through the exercise of reasonable care.

38.     At all relevant times, Tesla knew that the Vehicle and component features, including Autopilot, would be operated without inspection for defects.

39.     The Vehicle and component features, including Autopilot, were unreasonably dangerous for use in their intended manner by reason of defects in its manufacture, design, and testing so that they would not safely serve their purpose, but would instead expose the users of the Vehicle and others, to serious injuries because of Tesla's failure to properly guard and protect the users of the Vehicle, and others, from its defective design.

40.     The risks inherent in the design of the Vehicle and component features, including Autopilot, significantly outweighed any benefits of such design.

41.     At no time did Mr. Gillie know, or could have known, that the Vehicle and component features, including Autopilot, were designed, manufactured, marketed, and distributed by Tesla in a manner that was defective and unreasonably dangerous to the extent that that a reasonable consumer, including Mr. Gillie, knowing of such risks and lack of foreseeable benefits, would not purchase the Vehicle and component features, including Autopilot, for its intended purpose.

42.     As a direct and proximate result of one or more of the aforementioned

7

defective and unreasonably dangerous conditions, the Vehicle suddenly and unexpectedly veered left across highway lane markers toward a construction zone while Autopilot was activated, causing the Vehicle to collide with a construction barricade, resulting in the Vehicle sustaining significant damage and Mrs. Gillie sustaining significant personal injuries.

43.     As a further direct and proximate result of one or more of the aforementioned defective and unreasonably dangerous conditions, MemberSelect paid $112,445.54, including the deductible, to Mr. Gillie to replace the property damaged, all to the loss and detriment of MemberSelect.

44.     Pursuant to the terms of The Policy, MemberSelect is subrogated to Mr. Gillie's right to recover against Tesla, to the extent that MemberSelect has made payments to Mr. Gillie for damages resulting from the incident described elsewhere herein in the amount of $112,445.54, including the deductible.

WHEREFORE, Plaintiff, MEMBERSELECT INSURANCE COMPANY, as subrogee of David Gillie, requests that this Honorable Court enter judgment against Defendant, TESLA, INC., in the amount of $112,445.54, including the deductible, plus costs associated with and incurred in this action and further requests such other relief as this Court deems just and proper.

## COUNT II
### Negligence

45.     MemberSelect re-alleges and reasserts paragraphs 1 through 44 of the Complaint as though fully set forth herein as paragraph 45 of this Count II.

46.     At all relevant times, Tesla owed a duty to Mr. Gillie to safely and properly design, manufacture, market, and distribute the Vehicle and component features, including

Autopilot, so that they were not unreasonably dangerous when used in the manner intended

or in a manner reasonably foreseeable to Tesla.

47.     At all relevant times, Tesla owed a duty of reasonable care to Mr. Gillie to

design, manufacture, market, and distribute the Vehicle and component features, including

Autopilot in a reasonably safe condition at the time the Vehicle left Tesla's control.

48.     At all relevant times, Tesla owed a duty to warn Mr. Gillie of any potentially

dangerous conditions that Tesla knew, or should have known, existed within the Vehicle and

component features, including Autopilot, of which could not be discovered by Mr. Gillie

through the exercise of reasonable care.

49.     At the time Tesla placed the Vehicle and component features, including

Autopilot, into the stream of commerce, Tesla committed one or more of the following

negligent acts and omissions:

a.     Failed to use due care in the manufacture, distribution, design, sale, and/or testing of the Vehicle and component features, including Autopilot, in order to avoid the aforementioned risks to individuals;

b.     Failed to provide adequate warnings to users of the potential failure of Autopilot to detect high way lane markers and its propensity to cause and/or contribute to an accident;

c.     Failed to incorporate or design within the Vehicle and component features, including Autopilot, reasonable safeguards and protections against the failure to detect high way lane markers and the consequences thereof;

d.     Failed to make timely correction to the design of the Vehicle and component features, including Autopilot, to correct the failure to detect highway lane markers;

e.     Failed to adequately identify and mitigate the hazards associated with the failure to detect high way lane makers of the Vehicle and component features, including Autopilot, in accordance with proper engineering practice;

      f.     Failed to design the Automatic Emergency Braking (AEB) system in such a way that would provide any warning or automated braking for the collision event;

      g.    Designed the Vehicle and component features, including Autopilot, in such a way that allowed drivers to completely remove their hands from the steering wheel while the system was activated;

      h.    Failed to include adequate warnings to drivers who remove their hands from the steering wheel while Autopilot was activated;

      i.     Was otherwise careless or negligent.

50.    According to generally accepted production practices, a practical and technically feasible alternative production practice was available at the time the Vehicle left Tesla's control, which would have prevented the harm suffered by Mr. Gillie without significantly impairing the usefulness or desirability of the Vehicle and without creating equal or greater risk to others.

51.    At no time did Mr. Gillie know, or could have known, that the Vehicle and component features, including Autopilot, were designed, manufactured, marketed, and distributed by Tesla in a manner that was defective and unreasonably dangerous to the extent that that a reasonable consumer, including Mr. Gillie, knowing of such risks and lack of foreseeable benefits, would not purchase the Vehicle and component features, including Autopilot, for its intended purpose.

52.    As a direct and proximate result of one or more of the aforementioned breaches of duty, the Vehicle suddenly and unexpectedly veered left across highway lane markers toward a construction zone while Autopilot was activated, causing the Vehicle to collide with a construction barricade, resulting in the Vehicle sustaining significant damage and Mrs. Gillie sustaining significant personal injuries.

53.    As a further direct and proximate result of one or more of Tesla's

10

aforementioned breaches of duty, MemberSelect paid $112,445.54, including the deductible, to Mr. Gillie to replace the property damaged, all to the loss and detriment of MemberSelect.

54.     Pursuant to the terms of the Policy, MemberSelect is subrogated to Mr. Gillie's right to recover against Tesla, to the extent that MemberSelect has made payments to Mr. Gillie for damages resulting from the incident described elsewhere herein in the amount of $112,445.54, including the deductible.

WHEREFORE, Plaintiff, MEMBERSELECT INSURANCE COMPANY, as subrogee of David Gillie, requests that this Honorable Court enter judgment against Defendant, TESLA, INC., in the amount of $112,445.54, including the deductible, plus costs associated with and incurred in this action and further requests such other relief as this Court deems just and proper.

## COUNT III
## Failure to Warn

55.     MemberSelect re-alleges and reasserts paragraphs 1 through 54 of the Complaint as though fully set forth herein as paragraph 55 of this Count III.

56.     At all relevant times, Tesla owed Mr. Gillie a duty to warn Mr. Gillie of any potentially dangerous defects within the Vehicle and component features, including Autopilot, and to assure the Vehicle and component features, including Autopilot, would pose unreasonable and dangerous risks to users.

57.     At all relevant times, Tesla knew that the Vehicle and component features, including Autopilot, would be purchased and used by Mr. Gillie without inspection for defects in the design of the Vehicle or component features, including Autopilot.

58.     At all relevant times, Tesla knew or should have known of the substantial dangers involved in the reasonably foreseeable use of the Vehicle and component features,

including Autopilot, whose defective design, manufacturing, and lack of sufficient warnings caused the Vehicle to have an unreasonably dangerous propensity to suffer from sudden and unintended swerving and veering when Autopilot was activated and thereby cause injuries.

59.     Tesla failed to adequately warn of the substantial dangers known or knowable at the time of Tesla designed, manufactured, and distributed the Vehicle and component features, including Autopilot.

60.     Tesla failed to provide adequate warnings, instructions, guidelines or admonitions to Mr. Gillie of defects, which Tesla knew, or in the exercise of reasonable care should have known, existed in the Vehicle and component features, including Autopilot.

61.     Tesla knew that these substantial dangers were not readily recognizable to ordinary consumers, including Mr. Gillie, and that ordinary consumers would purchase and use the Vehicle and component features, including Autopilot, without inspection.

62.     At the time of the collision, Mr. Gillie was using the Vehicle and component features, including Autopilot, in the manner intended by Tesla and in a manner that was reasonably foreseeable by Tesla.

63.     Tesla committed one or more of the following negligent acts and omissions by placing the Vehicle and component features, including Autopilot, into the stream of commerce in a defective and unreasonably dangerous condition without providing adequate warnings of its dangers, including the following:

  a.  The danger of the Vehicle and component features, including Autopilot, failing to operate as intended under reasonably anticipated use conditions;

  b.  Failed to adequately warn Mr. Gillie of the serious risk that the vehicle would suddenly and unexpectedly veer across highway lane markers;

c. Failed to adequately warn Mr. Gillie of the serious risk that the Vehicle and component features, including Autopilot, would fail to detect high way lane markers;

d. Failed to provide adequate warnings to users of the potential failure of Autopilot to detect high way lane markers and its propensity to cause and/or contribute to an accident;

e. Failed to incorporate or design within the Vehicle and component features, including Autopilot, reasonable safeguards and protections against the failure to detect high way lane markers and the consequences thereof;

f. Failed to make timely correction to the design of the Vehicle and component features, including Autopilot, to correct the failure to detect highway lane markers;

g. Failed to adequately identify and mitigate the hazards associated with the failure to detect high way lane makers of the Vehicle and component features, including Autopilot, in accordance with proper engineering practice;

h. Failed to design the Automatic Emergency Braking (AEB) system in such a way that would provide any warning or automated braking for the collision event;

i. Designed the Vehicle and component features, including Autopilot, in such a way that allowed drivers to completely remove their hands from the steering wheel while the system was activated;

j. Failed to include adequate warnings to drivers who remove their hands from the steering wheel while Autopilot was activated;

k. The danger of the Vehicle and component features, including Autopilot, inability to operate as marketed under reasonably anticipated use conditions.

64.     At no time did Mr. Gillie know, or could have known, that the Vehicle and component features, including Autopilot, were designed, manufactured, marketed, and distributed by Tesla in a manner that was defective and unreasonably dangerous to the extent that a reasonable consumer, including Mr. Gillie, knowing of such risks and lack of foreseeable benefits, would not purchase the Vehicle and component features, including Autopilot, for its intended purpose.

13

65.     As a direct and proximate result of one or more of the aforementioned breaches of duty, the Vehicle suddenly and unexpectedly veered left across highway lane markers toward a construction zone while Autopilot was activated, causing the Vehicle to collide with a construction barricade, resulting in the Vehicle sustaining significant damage and Mrs. Gillie sustaining significant personal injuries.

66.     As a further direct and proximate result of one or more of Tesla's aforementioned breaches of duty, MemberSelect paid $112,445.54, including the deductible, to Mr. Gillie to replace the property damaged, all to the loss and detriment of MemberSelect.

67.     Pursuant to the terms of the Policy, MemberSelect is subrogated to Mr. Gillie's right to recover against Tesla, to the extent that MemberSelect has made payments to Mr. Gillie for damages resulting from the incident described elsewhere herein in the amount of $112,445.54, including the deductible.

WHEREFORE, Plaintiff, MEMBERSELECT INSURANCE COMPANY, as subrogee of David Gillie, requests that this Honorable Court enter judgment against Defendant, TESLA, INC., in the amount of $112,445.54, including the deductible, plus costs associated with and incurred in this action and further requests such other relief as this Court deems just and proper.

## COUNT IV
### Breach of Warranty

68.     MemberSelect re-alleges and reasserts paragraphs 1 through 67 of the Complaint as though fully set forth herein as paragraph 68 of this Count IV.

69.     At all relevant times, Tesla was the manufacturer, distributor, warrantor, and seller of the Vehicle and its component features, including Autopilot, of which Tesla knew or

had reason to know of the specific use for which the Vehicle and its component features, including Autopilot, were purchased.

70.     In selling the Vehicle and component features, including Autopilot, to Mr. Gillie, Tesla warranted that the Vehicle and component features, including Autopilot, were safe for their intended use, were free from manufacturing or production defects, were of merchantable quality, were adequately tested, and would perform as marketed.

71.     Tesla warranted that the Vehicle and component features, including Autopilot, were merchantable and fit for the ordinary purposes for which they were sold, were free from defects that permit sudden and unintended veering to occur while Autopilot was activated, and contained adequate fail-safes to protect against such sudden and unintended veering while Autopilot was activated.

72.     Contrary to the applicable warranties, the Vehicle and component features, including Autopilot, at the time of sale and all relevant times thereafter were not fit for their ordinary and intended purpose of providing Mr. Gillie with reliable, durable, and safe transportation.

73.     At no time did Mr. Gillie know, or could have known, that the Vehicle and component features, including Autopilot, were designed, manufactured, marketed, and distributed by Tesla in a manner that was defective and unreasonably dangerous to the extent that that a reasonable consumer, including Mr. Gillie, knowing of such risks and lack of foreseeable benefits, would not purchase the Vehicle and its component features, including Autopilot, for its intended purpose.

74.     As a direct and proximate result of one or more of the aforementioned breaches of warranty, the Vehicle suddenly and unexpectedly veered left across highway lane markers toward a construction zone while Autopilot was activated, causing the Vehicle to

15

collide with a construction barricade, resulting in the Vehicle sustaining significant damage and Mrs. Gillie sustaining significant personal injuries.

75.     As a further direct and proximate result of one or more of Tesla's aforementioned breaches of warranty, MemberSelect paid $112,445.54, including the deductible, to Mr. Gillie to replace the property damaged, all to the loss and detriment of MemberSelect.

76.     Pursuant to the terms of the Policy, MemberSelect is subrogated to Mr. Gillie's right to recover against Tesla, to the extent that MemberSelect has made payments to Mr. Gillie for damages resulting from the incident described elsewhere herein in the amount of $112,445.54, including the deductible.

WHEREFORE, Plaintiff, MEMBERSELECT INSURANCE COMPANY, as subrogee of David Gillie, requests that this Honorable Court enter judgment against Defendant, TESLA, INC., in the amount of $112,445.54, including the deductible, plus costs associated with and incurred in this action and further requests such other relief as this Court deems just and proper.

## COUNT V
### Non-Specific Product Defect

77.     MemberSelect re-alleges and reasserts paragraphs 1 through 76 of the Complaint as though fully set forth herein as paragraph 77 of this Count V.

78.     At all relevant times, the Vehicle and component features, including Autopilot, were used for their intended purpose in a manner reasonably foreseeable to Tesla and were not put to any abnormal use during the Vehicle's service life.

79.     There was no secondary cause of the Collision.

80.     The Vehicle and component features, including Autopilot, failed to perform in a manner reasonably expected of the Vehicle in light of its nature and intended function.

WHEREFORE, Plaintiff, MEMBERSELECT INSURANCE COMPANY, as subrogee of David Gillie, requests that this Honorable Court enter judgment against Defendant, TESLA, INC., in the amount of $112,445.54, including the deductible, plus costs associated with and incurred in this action and further requests such other relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff, MEMBERSELECT INSURANCE COMPANY, as subrogee of David Gillie, hereby demands trial by jury for all issues deemed so triable.

Respectfully submitted,

LEAHY, EISENBERG & FRAENKEL, LTD.


By: /s/ Robert Ostojic
Counsel for Plaintiff


Robert Ostojic (ARDC No. 6216651)
Nick V. Marinkovich (ARDC No. 6324293)
Leahy, Eisenberg & Fraenkel, Ltd.
33 West Monroe Street, Suite 1100
Chicago, Illinois 60603
Tel. (312) 368-4554
ro@lefltd.com

17